**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED BY ___NH___ D.C.

JUN 2 3 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**MONSTER ENERGY COMPANY,**

**Plaintiff,**

vs.

**JACK H. OWOC, et al.,**

**Defendants**

CASE NO.: 0:24-mc-60357-RLR

Assigned to: Judge Robin L. Rosenberg
Referred to: Magistrate Judge Panayotta D. Augustin-Birch

## MOTION TO ENFORCE THE ONE SATISFACTION RULE AND BAR ADDITIONAL COLLECTION BY MONSTER ENERGY COMPANY AND TO REQUIRE MONSTER ENERGY TO DISMISS ALL CLAIMS AND REMOVE ALL LIENS

COMES NOW Defendant, **Jack H. Owoc**, pro se, and respectfully submits this Motion to Enforce the One Satisfaction Rule and prohibit Plaintiff, **Monster Energy Company ("Monster")**, from pursuing further recovery against him personally, on the grounds that Monster has already received more than full satisfaction of its claims through the bankruptcy sale of Vital Pharmaceuticals, Inc. ("VPX") and the 9019 settlement. In support thereof, Defendant states as follows:

### I. INTRODUCTION

The Asset Purchase Agreement ("APA") and the 9019 Settlement Order together form a court-approved, comprehensive resolution of Monster Energy's claims against Vital Pharmaceuticals, Inc. ("VPX") and any related parties. As part of this resolution, Monster knowingly and voluntarily agreed to treat its litigation judgment as a non-priority, unsecured claim under the bankruptcy plan. In doing

1

so, it relinquished any claim to administrative priority status and waived any future attempts at collection outside of the bankruptcy process.

This agreement was not conditional; rather, it was binding, enforceable, and intended to fully and finally resolve Monster's financial interests in connection with its litigation against VPX and Mr. Jack Owoc. Critically, the APA (attached as Exhibit A) and the 9019 Order (attached as Exhibit B) were cross-conditioned. That is, Monster was entitled to the benefits of the asset purchase only if it agreed to settle its claims pursuant to the 9019 Settlement. In essence, Monster got paid because it settled. This was not merely a logistical detail of the transaction—it was a legally binding structure approved by the bankruptcy court. The 9019 Order explicitly provided that Monster's claims would be deemed Allowed Unsecured Claims, stripped of administrative claim rights, and governed by the standard distribution waterfall applicable to general unsecured creditors in the bankruptcy case. Therefore, Monster cannot now seek further recovery outside of that court-supervised process without violating the terms of the settlement and asset sale. Under Section 7.2 of the APA, Monster expressly agreed that its claims—including those asserted in the California District Court Action—would be "deemed allowed" solely as unsecured claims within the bankruptcy estate.

The APA further stated that Monster "shall not have an allowed administrative claim" in the bankruptcy proceeding. These provisions were not hypothetical or tentative—they were subsequently formalized in the 9019 Order and formed the foundation of the court-approved asset transfer to Monster. By voluntarily converting its approximately $377 million judgment into a general unsecured claim—and with full knowledge that any recovery would be limited by the bankruptcy distribution structure—Monster made an affirmative, strategic choice to resolve its litigation through the equitable and orderly processes of bankruptcy law. Having elected this path, Monster is now precluded from pursuing any further recovery, including from Jack Owoc personally, outside of the bankruptcy framework. This Court is now called upon to enforce long-settled legal principles, including the

2

fundamental rule that a creditor cannot recover twice for the same injury. Despite having settled its $377 million judgment through the VPX bankruptcy sale for a fraction of its face value, and acquiring the Bang Energy assets at a significantly discounted price, Monster continues to pursue Mr. Owoc personally for the full amount of the judgment. This conduct constitutes an impermissible double recovery and violates: The One Satisfaction Rule; The express terms of the APA and 9019 Order; Core principles of bankruptcy law and equity; and The doctrine of unjust enrichment.

## II.     LEGAL STANDARD UNDER THE ONE SATISFACTION RULE

The One Satisfaction Rule is a fundamental principle in both federal and state law that prohibits a plaintiff from recovering more than once for the same injury. As established in *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1276–77 (11th Cir. 2008), "A plaintiff is entitled to only one satisfaction for a single injury." This holds true even when damages are sought under different legal theories, as reaffirmed in *Mickens v. Tenth Judicial Circuit*, 181 So. 3d 1231, 1234 (Fla. 2d DCA 2015): "Even where the damages arise from different causes of action…" Further, the *Restatement (Second) of Judgments § 50* provides that the "satisfaction of the judgment… bars further proceedings." Together, these authorities make clear that double recovery for a single harm is strictly prohibited under law.

In the present case, Monster Energy was awarded $293 million in litigation damages, but subsequently acquired VPX's assets for $362 million—an acquisition that yielded Monster a taxable gain of $227 million, according to the IRS. That gain arose directly from the very same set of facts that underpinned the injury asserted in the litigation. It constitutes a recognized economic offset, meaning Monster has already been compensated for the alleged harm. To allow Monster to retain both the litigation award and the enormous windfall from the undervalued acquisition would violate well-settled black-letter law and run afoul of the One Satisfaction Rule.

The IRS imposed a $45.4 million capital gains tax on Monster Energy's acquisition of Bang Energy, which—based on an estimated 20% capital gains rate—implies a $227 million bargain purchase gain (Exhibit C). This indicates the IRS deemed Bang Energy's fair market value to be at least $589 million, confirming that Monster received a substantial windfall. Under 26 C.F.R. § 1.61-6, such a gain is includible in gross income, underscoring that this was a real and immediate economic benefit—not a theoretical one.

Critically, this tax assessment was calculated without access to key mean valuation evidence: from a $3.2 billion to $3.7 billion enterprise valuation by Kroll, a $3.7 billion offer from Keurig Dr Pepper, and an $800 million to $1 billion offer from Cerberus Capital. Had the IRS been presented with this information, the recognized gain—and resulting tax—would have likely been significantly higher. As it stands, the $227 million figure represents a conservative floor, not a ceiling, in the true value of the transaction.

In acquiring Bang Energy, Monster gained ownership of not only the brand but also its proprietary formulas, trademarks, patents, goodwill, national DSD network valued at $125 million, manufacturing assets, and valuable alcohol patents. These facts point to an unmistakable case of undervaluation and bankruptcy abuse. A massive fire-sale discount on a brand with over $7.25 billion in lifetime retail sales is indefensible absent fraudulent concealment of valuation data. The hallmarks of bankruptcy fraud are present: suppression of third-party offers, disregard of certified valuation reports, and a sale process engineered to benefit Monster at the expense of the estate. Monster not only acquired Bang at a deep discount with an estimated $227 million gain—it is now still seeking to enforce a $337+ million judgment, completing a calculated and unjust windfall.

## III.    ARGUMENT

### A. MONSTER ENERGY'S UNLAWFUL ACQUISITION OF BANG ENERGY, FTC INACTION, AND VIOLATION OF THE ONE SATISFACTION RULE

Monster Energy's lawsuits were not filed to address real injury but to destroy its closest rival, Bang Energy, eliminate its founder Jack Owoc, and monopolize the performance energy drink market—a category Mr. Owoc created. Monster's own CEO, Rodney Sacks, admitted under oath that Bang pioneered the performance energy space, setting it apart from traditional sugary energy drinks like Monster.

Monster's internal research showed that only 3% of consumers cared about the "Super Creatine" claim at the center of the lawsuit. The remaining 97% chose Bang for its sugar-free formula, bold flavors, positive branding, and massive influencer-driven marketing—unlike Monster's sugary drinks, which contain 57 grams of sugar per can and have been linked to 20 deaths, 10 heart attacks, and 105 serious adverse events, according to a GAO report obtained via FOIA (Exhibit D).

Bang didn't try to compete in Monster's lane—it created a new energy category, rooted in athletic performance, zero sugar, zero artificial colors, 43 flavors, prioritizing health. Owoc's innovation led to billions in sales by tapping into a health-conscious consumer base of athletes, gamers, bodybuilders, and everyday fitness-minded individuals—people unlikely to drink Monster's deadly, health-destroying, sugar-laden product.

Yet, Monster pursued a relentless, multi-lawsuit, 13-year legal campaign against Bang and Mr. Owoc, ultimately obtaining a judgment that enabled it to buy Bang through bankruptcy proceedings. This amounts to a blatant violation of the **One Satisfaction Rule**, which bars double recovery for the same harm. Monster cannot lawfully collect damages in court after acquiring the defendant's assets in bankruptcy.

This maneuver also violates **11 U.S.C. § 550(d)**, which prohibits unjust enrichment in bankruptcy. Monster's litigation windfall followed by a high suspect bargain acquisition of Bang's billion-dollar brand is exactly the type of abuse that no court of equity should allow—and the FTC should have never let it happen.

## B. ANTITRUST VIOLATIONS: ILLEGAL MONOPOLIZATION AND COLLUSION

Monster Energy's acquisition of Bang Energy—its most significant and direct competitor—violates multiple provisions of federal antitrust law, as well as common law and statutory protections against unfair business practices.

First, under the **Sherman Antitrust Act, 15 U.S.C. § 2**, it is unlawful for any person or entity to monopolize, or attempt to monopolize, any part of trade or commerce. Monster's sustained litigation campaign against Bang Energy, followed by its subsequent acquisition of the company, is a textbook example of attempted monopolization. Rather than competing on the merits, Monster used the courts as a weapon to eliminate its primary rival.

Second, Monster's actions violate **Section 7 of the Clayton Act, 15 U.S.C. § 18**, which prohibits mergers or acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly." Number two energy drink, Monster acquiring number three energy drink, Bang Energy—its largest and most disruptive independent competitor, after driving it into bankruptcy through aggressive litigation, effectively neutralized meaningful competition in the energy drink market. This acquisition should have been reviewed and blocked by the Federal Trade Commission (FTC) under existing merger guidelines.

Third, Monster's conduct constitutes a **common law abuse of process**. The company misused judicial proceedings, not to obtain legitimate legal relief, but to financially cripple Bang Energy, force

out its founder Jack Owoc, and then acquire the brand—valued in the billions—for a fraction of its true worth. This manipulation of the judicial system for improper ends exemplifies the tort of abuse of process.

Fourth, Monster's actions fall within the scope of **unfair competition and business torts**, including violations of **California's Business and Professions Code § 17200**, which prohibits unlawful, unfair, and fraudulent business practices. Monster engaged in a calculated campaign targeting Bang Energy's intellectual property, business goodwill, and market share, using unfair and deceptive tactics to gain control of its rival's assets.

Fifth, Monster is not entitled to immunity under the **Noerr-Pennington doctrine**, which protects legitimate petitioning of the government, including the courts. As established in *Professional Real Estate Investors v. Columbia Pictures Industries*, 508 U.S. 49 (1993), sham litigation is not protected. Monster's lawsuits against Bang were objectively baseless and were initiated with the primary intent to harm a competitor rather than to resolve any actual legal dispute. As such, they fall within the **sham litigation exception** to Noerr-Pennington immunity.

Lastly, Monster's conduct violates **Section 5 of the FTC Act, 15 U.S.C. § 45(a)**, which prohibits unfair methods of competition and deceptive practices.

### C. THE FTC'S CORRUPTION, COLLUSION, AND CAPITULATION

The Federal Trade Commission (FTC) originally committed to conducting an eight-month antitrust review of the Monster–Bang acquisition due to its anticompetitive implications. However, after Monster refused to produce the required documents, the FTC shockingly abandoned its inquiry within two weeks, and approved the acquisition.

This wasn't just dereliction of duty—it was actual misconduct. The FTC's General Counsel even blocked a FOIA request from Mr. Owoc, who had every legal and ethical right to view the records as Bang Energy's 100% equity owner. **Exhibit G.**

This unexplained and abrupt reversal by the FTC directly facilitated Monster's consolidation of market power in a manner that plainly warranted enforcement under Section 7 of the Clayton Act, including mandatory divestiture and injunctive relief. The conduct of the Commission in this matter reflects a textbook example of regulatory capture—where a regulatory agency established to serve and protect public interest instead acts to advance the commercial interests of the very entity it was meant to regulate.

## D. THE TRUE VALUE OF BANG ENERGY – STOLEN THROUGH FRAUD AND LITIGATION ABUSE

Kroll LLP—a top-tier financial valuation firm—placed Bang Energy's value in the multi-billion-dollar range. **Exhibit E**. At the same time, Keurig Dr Pepper (KDP) made a $3.7 billion offer to purchase Bang directly from Mr. Owoc. Furthermore, Bloomberg and Reuters widely reported a transaction by KDP to acquire Bang for billions of dollars. The authenticity of this multi-billion-dollar offer was confirmed under oath by Charles Delo of Rothschild Investment Co. and by John Owoc, with supporting documentation included in the bankruptcy record. Yet, Monster acquired Bang out of bankruptcy at a fraction of its real value after orchestrating its destruction through litigation. **Exhibit F**

## E. THEFT BY LITIGATION: A DOUBLE RECOVERY BARRED BY LAW

The law is clear. Under Buci v. Village of Lincolnwood, and 11 U.S.C. § 550(d), only one recovery is permitted per injury. The judgment plus the acquisition gave Monster two recoveries—and

that is illegal. The court should have offset the judgment against the value of the acquisition, but it failed to do so required by the APA and 9019 Motion. (Exhibit A, Exhibit B)

### F. MONSTER'S DEADLY ENERGY DRINK VS. BANG'S UNIVERSITY RESEARCH PROVEN PERFRMANCE-ENHANCING SUGAR FREE FORMULA

Monster Energy has been linked to 20 deaths, 10 heart attacks, and over 100 serious adverse events, according to GAO data obtained via FOIA. (Exhibit D)

In contrast, Bang Energy contains zero sugar, no artificial colors or flavors, has a strong safety record, and is backed by university-led clinical studies with human test subjects. There are no reports of deaths, heart attacks, or serious adverse effects linked to Bang.

Unable to compete on merit, Monster resorted to litigation, misinformation, and allegedly manipulating the bankruptcy system. After driving Bang into the ground, Monster repackaged the brand and now sells it through Coca-Cola's distribution network—pretending they created it, while erasing the legacy of Jack Owoc, the founder they once envied and now seek to silence.

### G. FRAUDULENT ACQUISITION FOR $362 MILLION: SATISFACTION TENFOLD

In one of the most appalling abuses of bankruptcy law in modern history, Monster Energy Drink Corporation acquired Bang Energy for a mere $362 million—a fraction of its true value—through a bankruptcy process that was tainted by conflicted actors, and suppressed evidence. At the time of acquisition, Bang Energy had already been valued at ~$3.7 billion by Keurig Dr Pepper's formal acquisition offer, and independent assessments by Kroll LLP, one of the most reputable valuation firms in the world, supported this multibillion-dollar enterprise value. Around the same time Cerberus Capital Management L.P. spent hundreds of thousands of dollars researching and investigating the acquisition of Bang Energy. After many months of intense due diligence, meetings and presentations

by Mr. Owoc and his key staff members, and after spending many hours in the data room, Cerberus put forth an indication of interest to acquire Bang Energy for $1 billion dollars. Gary Smith, from Providence Capital, another interested Bang Energy bidder seeking to acquire Bang Energy stated, "Absolutely, Monster ran off Cerberus."   By all accounts Bang Energy was a multi-billion dollar brand—that was sabotaged and litigated into insolvency.

Monster's acquisition for $362 million was not simply a "satisfaction" of its alleged damages—it was a windfall ten times over. After obtaining a massive litigation judgment, Monster proceeded to take full control of Bang's brand equity, product IP, trademarks, customer loyalty, social media platforms, national shelf space, and a built-in revenue pipeline—all of which now generate profits under Monster's control and are being distributed through Coca-Cola's global distribution system. This is not a case of double satisfaction. It is tenfold satisfaction—a systemic looting of Bang Energy's market position, goodwill, and enterprise value through a corrupted bankruptcy that rewarded the very entity responsible for Bang's demise.

### H. FRAUD ON THE COURT AND VIOLATION OF THE ONE SATISFACTION RULE

This case is not a typical business dispute. It involves serious allegations of organized crime, RICO violations, and the weaponization of bankruptcy to steal a multi-billion-dollar company.

The claims include regulatory capture, FTC misconduct, board manipulation, suppression of a $3.7 billion bid, and widespread bankruptcy fraud. Monster Energy has ignored antitrust laws, violated the One Satisfaction Rule, and exploited the legal system at every level to carry out what amounts to legalized corporate theft.

### I. MONSTER'S OBSESSION WITH JACK OWOC AND THE WAR ON BANG ENERGY®

Monster Energy's actions against Jack Owoc and Bang Energy® were not just competitive—they were deeply personal. What started as market rivalry quickly turned into a vindictive obsession to destroy Mr. Owoc and the brand he created.

Monster launched an aggressive smear campaign, even distributing small defamatory cards in retail stores—some placed directly on Bang products—attacking Mr. Owoc by name. This was not advertising; it was a calculated effort to publicly discredit and humiliate him.

Bang Energy posed a serious threat to Monster's dominance. With former annual growth rates of 200–300%, a wide variety of flavors, a zero-sugar formula, and the backing of clinical research, Bang had redefined the energy drink category as a performance-based product. It was on track to become the second-largest energy drink brand in the world. Monster couldn't compete on innovation, so it turned to defamation and destruction.

For over 13 years, Monster waged a relentless legal campaign. One lawsuit after another, not to resolve actual disputes, but to exhaust Vital Pharmaceuticals' resources and momentum. The strategy was simple: outspend Mr. Owoc's legal team, drag the company through endless litigation, and seize the brand in bankruptcy for a fraction of its value.

Monster's blueprint was clear—use the courts to overwhelm Mr. Owoc, sabotage Bang's growth, and take control of the company through legal and financial pressure. That plan succeeded.

Most recently, Monster escalated its efforts by placing an unlawful lien on the Owoc family's Florida Homestead, where Jack, his wife, and their six children live. This property is constitutionally protected under Florida Homestead law, but Monster ignored those protections. Its ongoing misuse of the legal system shows a disregard not only for fair competition but for basic legal and ethical boundaries.

## J.  FINAL TRUTH: THE GREATEST SABOTAGE IN ENERGY DRINK HISTORY

This was never a fair fight. Jack Owoc built Bang Energy from scratch—a groundbreaking brand that redefined the energy drink market and delivered real performance. Monster didn't win through better products or innovation. It won through sabotage.

Instead of competing fairly, Monster weaponized the legal system, spread defamatory claims, and launched a calculated campaign to destroy Bang. Its actions represent one of the most blatant abuses of power in the history of the beverage industry.

Formerly operating as Hansen Beverage, Monster Beverage Corporation—now Monster Energy Corporation—has been involved in at least 419 lawsuits. Of those, 289 were initiated by the company itself, reflecting what appears to be one of the most extreme and sustained patterns of vexatious litigation in modern American corporate history.

Importantly, this figure likely captures only a portion of the company's full litigation footprint. Due to jurisdictional fragmentation, sealed court records, confidential settlements, and the lack of a centralized public litigation database, it is virtually impossible for private individuals or investigative entities to uncover the true total number of cases involving Monster. Nevertheless, even this partial record reveals a disturbing trend: a company that has weaponized the courts not to seek justice, but to intimidate competitors, suppress dissent, and overwhelm opponents through sheer legal force.

Had Monster not manipulated the process, Bang Energy would likely be the second-largest energy drink brand in the world today—and Monster would have lost its grip on the market.

This isn't just a case of corporate rivalry. It's a cautionary tale for every entrepreneur: when your innovation threatens a monopoly, they won't out-create you—they'll try to crush you with

lawsuits, deception, and money. Bang Energy thrived because it worked. Monster prevailed because it cheated.

## K.  BANG ENERGY'S INNOVATION AND SUCCESS

Jack Owoc invented Super Creatine, a creatine-leucine compound engineered to be water-stable and functional in ready-to-drink formulas. The trademark SUPER CREATINE® was officially registered on February 6, 2019 (Reg. No. 5,252,855). Between 2016 and 2019, VPX—Bang Energy's parent company—experienced explosive growth of approximately 200% year over year, generating an estimated $1.28 billion in retail sales in 2019, $626 million in net revenue, and an extraordinary $217 million in EBITDA. By 2022, VPX had become the third best-selling energy drink brand in the United States, following Red Bull and Monster Energy.

In 2018, Monster Energy filed a lawsuit in the Central District of California (Case No. 5:18-cv-1882), accusing VPX of false advertising related to the use of Super Creatine. The jury, in 2022, awarded Monster $293 million—a figure later increased with attorneys' fees. However, the litigation was deeply flawed. Monster's own internal study revealed that only 3% of consumers were influenced by Super Creatine, but the court barred this critical evidence from being presented to the jury. Furthermore, an independent study from the highly regarded Peking Biotech Medical School in China showed that Super Creatine, tested every two hours over a 24-hour period, significantly increased blood creatine levels throughout the duration. Despite the clear scientific relevance, the court actively suppressed this evidence and disallowed its introduction at trial.

The court had previously stated that it would allow the Super Creatine study into evidence if Monster "opened the door." When Megan Owoc, Senior Vice President of Marketing for Bang Energy, testified under oath that she was aware of a study confirming that Super Creatine elevated creatine levels in the blood, the court reneged on its promise and prohibited her testimony. This

reversal deprived the jury of key context that could have entirely changed the outcome of the case and potentially led to Mr. Owoc receiving compensation rather than a devastating judgment. Moreover, 97% of Bang customers chose the brand not because of Super Creatine but for its 43 innovative and flavorful options, cutting-edge marketing, and health and performance benefits. Megan Owoc testified that Bang's marketing emphasized its sugar-free formula, bold flavors, and uplifting brand style—contrasting sharply with Monster's deadly drink.

This lawsuit was not a legitimate legal dispute—it was a strategic move designed to weaponize litigation, bankrupt VPX, and eliminate a rising competitor. The conduct exhibited by Monster Energy fits the definition of sham litigation, abuse of process, and anticompetitive behavior.

In a second coordinated and highly suspect legal assault, Monster Energy secretly acquired rights to a 2010 confidential settlement agreement between VPX and Orange Bang, Inc.—an agreement never intended for third-party enforcement. Using this confidential contract as a pretext, Monster initiated arbitration proceedings against VPX. This maneuver, carried out without transparency or adequate notice, ultimately resulted in a $175 million arbitration award and imposed a 5% royalty on all future Bang sales. These legal and financial consequences created nearly $500 million liability for VPX, not including the indefinite and compounding royalty, which could eventually exceed one billion dollars. Monster's acquisition of the Orange Bang agreement was not only commercially predatory, but also legally questionable, possibly violating multiple state and federal laws. The legality of this tactic—particularly regarding improper contract assignment, antitrust violations through market consolidation, and potential fraud in inducement—has yet to receive appropriate judicial scrutiny.

Monster Energy Corp.'s acquisition of the Orange Bang licensing agreement was not a good-faith business move—it was a calculated scheme to sue and destroy its rival, Bang Energy. This

conduct constitutes a likely violation of federal antitrust law, including: Sherman Act §2 – Attempted monopolization through sham litigation and predatory legal tactics; FTC Act §5 – Engaging in unfair methods of competition by misusing a contract to eliminate a market rival; Abuse of Process – Weaponizing judicial procedures not to enforce rights, but to cripple a competitor; Tortious Interference – Disrupting Bang Energy's lawful business relations through a hostile takeover of its licensing agreement.

This is legal warfare masked as commercial enforcement, designed to suppress competition and monopolize the market. Monster's conduct reflects unclean hands and warrants immediate scrutiny by the FTC, DOJ, and courts as a blatant abuse of both contract and antitrust law.

### L.   VPX BANKRUPTCY AND MONSTER'S TAKEOVER

Forced into Chapter 11, VPX filed for bankruptcy protection in response to a relentless wave of litigation. In its first day filings and public press releases, VPX made clear that the purpose of the Chapter 11 filing was to stabilize the company, restructure, and protect its future growth. Bankruptcy professionals publicly stated on the company's behalf: "VPX intends to use the Chapter 11 process to recapitalize and emerge from bankruptcy well-positioned to continue its rapid growth in the beverage market" (Exhibit H). The company's official press release further emphasized that the bankruptcy filing was a "restorative action to help the company recover from recent challenges, including multiple lawsuits that impacted the Company's short-term outlook."

One of the primary objectives of the Chapter 11 filing, as repeatedly affirmed by VPX itself, was to shield the company from aggressive legal actions—particularly those initiated by Monster Energy. Despite this, just 30 days into the bankruptcy process, the automatic stay was lifted. This action was taken without the knowledge or consent of Jack Owoc, the founder and 30-year 100% equity owner and CEO of VPX, and directly undermined the very protections that the Chapter 11

15

process was intended to provide. The lifting of the stay left both VPX and Mr. Owoc personally exposed to ongoing legal attack and caused substantial, unnecessary damage. This abrupt reversal not only contradicted the company's stated strategy but also raises troubling questions about potential bankruptcy fraud. The timeline suggests a possible strategy to invoke the appearance of Chapter 11 protections publicly, while internally dismantling them to facilitate a highly suspect corporate takeover.

In addition to acquiring the Bang Energy brand and business operations, Monster Energy also gained substantial additional assets. Among the most significant was the Phoenix manufacturing facility, a state-of-the-art plant capable of producing 3,600 cans per minute and up to 70 million cases per year. With an estimated profit of $3.72 per case, this facility alone could generate $260,400,000 annually. Monster received this entire facility as part of the $362 million acquisition, without paying anything extra. Furthermore, Monster acquired 115 alcohol-related trademarks and two highly valuable alcohol-related patents for a severely undervalued amount of just $10 million. These patents grant a monopoly over the addition of electrolytes to alcoholic beverages, a technological edge that could be worth billions of dollars in the growing alcoholic beverage market.

## M. IRS EVIDENCE OF FULL SATISFACTION AND FRAUDULENT UNDERVALUATION (Based on IRS-Imposed Bargain Purchase Tax Gain and Third-Party Valuations, **EXHIBIT C**)

This Court should apply the One Satisfaction Rule and bar Monster Energy Company from recovering any further damages against Bang Energy (Vital Pharmaceuticals, Inc.) or its founder, Jack Owoc, because Monster has already received compensation far exceeding any alleged harm. Monster's acquisition of Bang Energy produced a significant financial windfall that includes a $45.4 million capital gains tax imposed by the IRS—reflecting an estimated $227 million bargain purchase

gain—along with independent third-party valuations and multi-billion-dollar acquisition offers from Keurig Dr Pepper and Cerberus Capital. These factors collectively establish that Monster Energy not only recouped its supposed losses but profited well beyond them.

The $45.4 million tax liability assessed by the IRS is not speculative. Under a presumed 20% capital gains rate, the IRS recognized a $227 million gain from Monster's acquisition, implying Bang Energy's fair market value was at least $589 million. This figure was derived from adding the $227 million IRS-recognized gain to the $362 million purchase price. The IRS made this determination based on structured valuation methodologies and legal standards, such as those under 26 C.F.R. § 1.61-6, which states that gain realized from acquiring property for less than fair market value is includible as taxable income. Thus, the IRS confirmation of an economic gain proves that Monster underpaid substantially and still received a large financial benefit.

Critically, this $227 million gain is a conservative figure, as the IRS reached it without access to vital valuation evidence. The agency was not provided with a $3.7 billion enterprise valuation of Bang Energy prepared by Kroll, nor the $3.7 billion acquisition offer from Keurig Dr Pepper or the $1 billion bid from Cerberus Capital. Had this information been disclosed, the IRS's calculated bargain purchase gain and related tax would have dramatically increased, possibly into the hundreds of millions more—demonstrating that the true benefit Monster received was vastly understated.

This context raises serious concerns about fraud, bankruptcy misconduct, and deliberate undervaluation. The IRS relies on hard data, not conjecture, so the $227 million gain implies that Bang Energy's assets were systemically undervalued in the sale. Given Bang Energy's $7.25+ billion lifetime retail sales, proprietary intellectual property, powerful branding, and a $125 million distribution system, the $362 million acquisition price—representing a massive fire-sale discount—

is simply not justifiable. Such a discount is only plausible if fair market valuations were hidden, competing offers were ignored, or collusion occurred during the bankruptcy process.

The hallmarks of bankruptcy fraud are evident in the exclusion of KDP and Cerberus's offers, the suppression of Kroll's valuation, and the failure to disclose any of this to the bankruptcy court or the IRS. These omissions amount to fraudulent concealment of material financial information, deprivation of a fair, market-based sale process, and a transaction structured to benefit one bidder— Monster Energy—at the direct expense of creditors, equity holders, and the public tax system.

## N. **CALIFORNIA AND FLORIDA SET-OFF PRINCIPLES: LIMITATIONS ON DOUBLE RECOVERY**

i. ***Both California and Florida law prohibit double recovery and require set-offs when a creditor has already received full or partial satisfaction for their claims.***

Under both California and Florida law, courts prohibit double recovery and require set-offs when a creditor or plaintiff has already received full or partial satisfaction for their claims. In California, the principle is well-established through case law. In *Reed v. Wilson*, 73 Cal. App. 4th 439 (1999), the court held that set-offs are necessary to prevent unjust enrichment by ensuring a plaintiff does not collect twice for the same claim. Similarly, in *Engle v. Endlich*, 9 Cal. App. 4th 1152 (1992), it was made clear that a settlement with one tortfeasor must reduce claims against others by the full amount of that settlement. The California courts reaffirmed this rule in *Hoch v. Allied-Signal, Inc.*, 24 Cal. App. 4th 48 (1994), emphasizing that a plaintiff cannot recover more than the actual amount of damages suffered.

Florida law likewise mandates that courts apply set-offs to avoid multiple recoveries for a single injury. Section 768.041(2), Florida Statutes, requires that any compensation already received must be deducted from any remaining judgment or claim. In *Escadote I Corp. v. Ocean Three, Ltd. P'ship*, 211 So. 3d 1059 (Fla. Dist. Ct. App. 2016), the court confirmed that set-offs must be applied

to reflect prior payments. The Florida Supreme Court in *Buczkowski v. McKay*, 490 So. 2d 1282 (Fla. 1986), held that once a plaintiff receives full satisfaction, no further claims may proceed. This prohibition on double recovery has been consistently upheld, including in *Cunningham v. Haroona*, 741 So. 2d 603 (Fla. Dist. Ct. App. 1999), where the court ruled that additional compensation is barred when a party has been fully paid for their injuries.

In *D'Angelo v. Fitzmaurice*, 863 So. 2d 311 (Fla. 2003), the Florida Supreme Court further clarified that courts must account for prior recoveries and apply appropriate set-offs. Similarly, in *Gouty v. Schnepel*, 795 So. 2d 959 (Fla. 2001), the Court emphasized that the law does not permit a plaintiff to obtain a windfall by receiving more than full compensation. The principle was again reiterated in *Boulos v. Morrison*, 880 So. 2d 246 (Fla. Dist. Ct. App. 2004), where the court ordered a set-off due to prior settlements covering the damages at issue.

### ii.    *Monster's Claims Were Fully Resolved in the Bankruptcy Case*

Monster's judgment was included as an **Allowed Unsecured Claim** under the APA and 9019 Order, with rights waived for administrative recovery and priority. Monster settled the lawsuit as part of the sale transaction.

### iii.    *Monster's Conduct Violates Equity and Constitutes Unjust Enrichment*

Monster Energy engaged in conduct that undermines the fairness of the bankruptcy process and now seeks to benefit from that conduct through continued enforcement of judgments. By suppressing competing bidders, Monster ensured that no market-driven sale could occur, thereby preventing Bang Energy from obtaining its fair market value. It further benefited from artificially low valuations, which were contradicted by independent appraisals and multi-billion-dollar third-party offers that were never properly considered or disclosed during the bankruptcy process. Despite having acquired Bang

19

Energy's valuable assets, brand, and intellectual property at a steep discount—and receiving a $227 million windfall recognized by the IRS—Monster continues to pursue personal judgments against Mr. Jack Owoc, the company's founder.

### iv.   *This Court Has Jurisdiction to Enforce Settlement Orders and Prevent Abuse*

This Court may enjoin Monster's duplicative enforcement and protect the integrity of prior bankruptcy orders. See Travelers Indem. Co. v. Bailey, 557 U.S. 137 (2009) Celotex Corp. v. Edwards, 514 U.S. 300 (1995)

### IV.   **CONCLUSION**

For the reasons stated above, Defendant Jack H. Owoc respectfully requests that this Court:

1.   Declare that Monster Energy's continued collection efforts against Mr. Owoc personally constitute an impermissible double recovery in violation of the One Satisfaction Rule;

2.   Issue an injunction prohibiting Monster from engaging in any further collection activity related to the judgment against Mr. Owoc;

3.   Order Monster to remove all existing liens from Mr. Owoc's personal and real property;

4.   Enforce the Asset Purchase Agreement (APA) and the Bankruptcy Court's 9019 Order as a final and binding settlement of Monster's claims; and

5.   Grant any further relief the Court deems just and appropriate.

Respectfully submitted,

**John (Jack) H. Owoc**

**Pro-Se Movant**

3052 N. Atlantic Blvd,
Fort Lauderdale, FL 33308
Jackowoc.ceo@gmail.com
PHONE: (954) 632-7119

**CERTIFICATE OF CONFERRAL PURSUANT TO LOCAL RULE 7.1(a)(2)**

Pursuant to Local Rule 7.1(a)(2) of the United States District Court for the Southern District of Florida, I, Jack H. Owoc, the pro se Defendant, certify that I attempted in good faith to confer with counsel for Plaintiff Monster Energy Company regarding the relief sought in the accompanying motion.

As of the time of this filing, counsel for Plaintiff opposes the relief requested, and the parties were unable to resolve the issues raised in the motion. Accordingly, the motion is respectfully submitted for the Court's consideration.

Respectfully submitted, June 20, 2025

**John (Jack) H. Owoc**