UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED BY _____ D.C.

AUG 1 1 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

MONSTER ENERGY COMPANY,

Plaintiff,

vs.

JACK H. OWOC, et al.,

Defendants

CASE NO.: 0:24-cv-60357-RLR

Assigned to: Judge Robin L. Rosenberg
Referred to: Magistrate Judge Panayotta D. Augustin-Birch

**DEFENDANT AMENDED MOTION TO ENFORCE THE ONE SATISFACTION RULE AND BAR ADDITIONAL COLLECTION BY MONSTER ENERGY COMPANY AND TO REQUIRE MONSTER ENERGY TO DISMISS ALL CLAIMS AND REMOVE ALL LIENS**

**COMES NOW** Defendant, **Jack H. Owoc**, pro se, and, pursuant to Federal Rule of Civil Procedure 60(b)(5) and 60(b)(6), respectfully moves this Court to enforce the One Satisfaction Rule and to bar Plaintiff, Monster Energy Company ("Monster"), from seeking any further recovery against him personally. As set forth herein, Monster has already obtained more than full satisfaction of its claims through the court-approved bankruptcy sale of Vital Pharmaceuticals, Inc. ("VPX") and the comprehensive settlement embodied in the Rule 9019 Order. Accordingly, further enforcement of the underlying judgment is neither legally nor equitably permissible. In support of this Motion, Defendant states as follows:

## I.  INTRODUCTION

In part, Federal Rule of Civil Procedure 60(b)(5) authorizes the Court to relieve a party from a final judgment where "the judgment has been satisfied, released, or discharged." This provision

1

squarely applies here, as Monster Energy Company ("Monster") has already received more than full satisfaction of its claims through the bankruptcy sale of Vital Pharmaceuticals, Inc. ("VPX") and the Rule 9019 settlement, leaving no legal or equitable basis to pursue additional recovery against Defendant personally. Rule 60(b)(6) likewise permits relief for "any other reason that justifies relief," which encompasses the equitable principles underlying the one satisfaction rule— namely, that a plaintiff is entitled to only one recovery for a single injury. To allow Monster to proceed further would constitute an impermissible double recovery, contravening both established case law and the plain language of Rule 60(b).

The Asset Purchase Agreement ("APA") and the 9019 Settlement Order together form a court-approved, comprehensive resolution of Monster Energy's claims against Vital Pharmaceuticals, Inc. ("VPX") and any related parties. As part of this resolution, Monster knowingly and voluntarily agreed to treat its litigation judgment as a non-priority, unsecured claim under the bankruptcy plan. In doing so, it relinquished any claim to administrative priority status and waived any future attempts at collection outside of the bankruptcy process.

This agreement was not conditional; rather, it was binding, enforceable, and intended to fully and finally resolve Monster's financial interests in connection with its litigation against VPX and Mr. Jack Owoc. Critically, the APA (attached as Exhibit A) and the 9019 Order (attached as Exhibit B) were cross-conditioned. That is, Monster was entitled to the benefits of the asset purchase only if it agreed to settle its claims pursuant to the 9019 Settlement. In essence, Monster got paid because it settled. This was not merely a logistical detail of the transaction—it was a legally binding structure approved by the bankruptcy court. The 9019 Order explicitly provided that Monster's claims would be deemed Allowed Unsecured Claims, stripped of administrative claim rights, and governed by the standard distribution waterfall applicable to general unsecured creditors in the bankruptcy case. Therefore, Monster cannot now seek further recovery outside of that court-supervised process without

2

violating the terms of the settlement and asset sale. Under Section 7.2 of the APA, Monster expressly agreed that its claims—including those asserted in the California District Court Action—would be "deemed allowed" solely as unsecured claims within the bankruptcy estate.

The APA further stated that Monster "shall not have an allowed administrative claim" in the bankruptcy proceeding. These provisions were not hypothetical or tentative—they were subsequently formalized in the 9019 Order and formed the foundation of the court-approved asset transfer to Monster. By voluntarily converting its approximately $377 million judgment into a general unsecured claim—and with full knowledge that any recovery would be limited by the bankruptcy distribution structure—Monster made an affirmative, strategic choice to resolve its litigation through the equitable and orderly processes of bankruptcy law. Having elected this path, Monster is now precluded from pursuing any further recovery, including from Jack Owoc personally, outside of the bankruptcy framework. This Court is now called upon to enforce long-settled legal principles, including the fundamental rule that a creditor cannot recover twice for the same injury. Despite having settled its $377 million judgment through the VPX bankruptcy sale for a fraction of its face value, and acquiring the Bang Energy assets at a significantly discounted price, Monster continues to pursue Mr. Owoc personally for the full amount of the judgment. This conduct constitutes an impermissible double recovery and violates: The One Satisfaction Rule; The express terms of the APA and 9019 Order; Core principles of bankruptcy law and equity; and The doctrine of unjust enrichment.

II.     **LEGAL STANDARD UNDER THE ONE SATISFACTION RULE**

The one satisfaction rule "generally provides that a plaintiff is entitled to only one satisfaction for a single injury, such that amounts received in settlement from an alleged tortfeasor are credited against judgments for the same injury against non-settling tortfeasors." *BUC Int'l Corp. v. Int'l Yacht Council, Ltd.,* 517 F.3d 1271, 1276 (11th Cir. 2008). "The one-satisfaction rule, however, is not

3

invoked as a counterdemand, but rather as an equitable doctrine designed to prevent multiple recoveries by a plaintiff on its own claim and for a single injury." Id. at 1276 n.5. see also *Haston v. Gold Coast Fed. Credit Union,* No. 22-CV-80004, 2022 WL 17477531, at *2 (S.D. Fla. Nov. 8, 2022)

Further, the *Restatement (Second) of Judgments § 50* provides that the "satisfaction of the judgment… bars further proceedings." Together, these authorities make clear that double recovery for a single harm is strictly prohibited under law.

In the present matter, the one satisfaction rule applies because there is only a single alleged injury at issue. Accordingly, Defendant respectfully moves to enforce the one satisfaction rule and bar Plaintiff, Monster Energy Company ("Monster"), from seeking any further recovery against him personally. Monster has already obtained more than full satisfaction of its claims through the bankruptcy sale of Vital Pharmaceuticals, Inc. ("VPX") and the Rule 9019 settlement.

Monster Energy was awarded $293 million in litigation damages, but subsequently acquired VPX's assets for $362 million—an acquisition that yielded Monster a taxable gain of $227 million, according to the IRS. That gain arose directly from the very same set of facts that underpinned the injury asserted in the litigation. It constitutes a recognized economic offset, meaning Monster has already been compensated for the alleged harm. To allow Monster to retain both the litigation award and the enormous windfall from the undervalued acquisition would violate well-settled black-letter law and run afoul of the One Satisfaction Rule.

The IRS imposed a $45.4 million capital gains tax on Monster Energy's acquisition of Bang Energy, which—based on an estimated 20% capital gains rate—implies a $227 million bargain purchase gain (Exhibit C). This indicates the IRS deemed Bang Energy's fair market value to be at least $589 million, confirming that Monster received a substantial windfall. Under 26 C.F.R. § 1.61-

6, such a gain is includible in gross income, underscoring that this was a real and immediate economic benefit—not a theoretical one.

Critically, this tax assessment was calculated without access to key mean valuation evidence: from a $3.2 billion to $3.7 billion enterprise valuation by Kroll, a $3.7 billion offer from Keurig Dr Pepper, and an $800 million to $1 billion offer from Cerberus Capital. Had the IRS been presented with this information, the recognized gain—and resulting tax—would have likely been significantly higher. As it stands, the $227 million figure represents a conservative floor, not a ceiling, in the true value of the transaction.

In acquiring Bang Energy, Monster gained ownership of not only the brand but also its proprietary formulas, trademarks, patents, goodwill, national DSD network valued at $125 million, manufacturing assets, and valuable alcohol patents. These facts point to an unmistakable case of undervaluation and bankruptcy abuse. A massive fire-sale discount on a brand with over $7.25 billion in lifetime retail sales is indefensible absent fraudulent concealment of valuation data. The hallmarks of bankruptcy fraud are present: suppression of third-party offers, disregard of certified valuation reports, and a sale process engineered to benefit Monster at the expense of the estate. Monster not only acquired Bang at a deep discount with an estimated $227 million gain—it is now still seeking to enforce a $337+ million judgment, completing a calculated and unjust windfall.

## III.   ARGUMENT

### A. MONSTER ENERGY'S UNLAWFUL ACQUISITION OF BANG ENERGY, FTC INACTION, AND VIOLATION OF THE ONE SATISFACTION RULE

The One Satisfaction Rule prohibits a plaintiff from recovering twice for a single injury. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390-91 (Tex. 2000) (limiting plaintiffs to a single recovery for a single injury, even if different theories of liability are alleged).

5

In part, Rule 60(b)(5) allows a court to relieve a party from a final judgment if "the judgment has been satisfied; released, or discharged." Rule 60(b)(6) allows the same remedy for "any other reason that justifies relief." Other courts have found Rule 60(b)(5) to be an appropriate vehicle through which to seek credit against all or part of a judgment for the amount paid by a settling co-defendant. See *Torres-Troche v. Municipality of Yauco*, 873 F.2d 499, 501 n. 7 (1st Cir. 1989); *Kassman v. Am. Univ.*, 546 F.2d 1029, 1033 (D.C. Cir. 1976) (noting that "a motion for a credit on a judgment should be treated as a Rule 60(b)(5) motion for relief from a judgment which has been satisfied, released or discharged"); Sunderland v. City of Philadelphia, 575 F.2d 1089, 1090-91 (3d Cir. 1978).

Monster Energy's lawsuits were not filed to address real injury but to destroy its closest rival, Bang Energy, eliminate its founder Jack Owoc, and monopolize the performance energy drink market—a category Mr. Owoc created. Monster's own CEO, Rodney Sacks, admitted under oath that Bang pioneered the performance energy space, setting it apart from traditional sugary energy drinks like Monster.

Monster's internal research showed that only 3% of consumers cared about the "Super Creatine" claim at the center of the lawsuit. The remaining 97% chose Bang for its sugar-free formula, bold flavors, positive branding, and massive influencer-driven marketing—unlike Monster's sugary drinks, which contain 57 grams of sugar per can and have been linked to 20 deaths, 10 heart attacks, and 105 serious adverse events, according to a GAO report obtained via FOIA (Exhibit D).

Bang didn't try to compete in Monster's lane—it created a new energy category, rooted in athletic performance, zero sugar, zero artificial colors, 43 flavors, prioritizing health. Owoc's innovation led to billions in sales by tapping into a health-conscious consumer base of athletes, gamers,

bodybuilders, and everyday fitness-minded individuals—people unlikely to drink Monster's deadly, health-destroying, sugar-laden product.

Yet, Monster pursued a relentless, multi-lawsuit, 13-year legal campaign against Bang and Mr. Owoc, ultimately obtaining a judgment that enabled it to buy Bang through bankruptcy proceedings. This amounts to a blatant violation of the **One Satisfaction Rule**, which bars double recovery for the same harm. Monster cannot lawfully collect damages in court after acquiring the defendant's assets in bankruptcy.

## B. MONSTER'S CLAIMS HAVE BEEN FULLY RESOLVED THROUGH THE BANKRUPTCY PROCESS, AND ANY FURTHER PURSUIT VIOLATES RULE 60(B) AND THE ONE SATISFACTION RULE

The Federal Rule of Civil Procedure 60(b)(5) authorizes the Court to relieve a party from a final judgment where "the judgment has been satisfied, released, or discharged." This provision is directly implicated here, as Monster Energy Company ("Monster") has already received more than full satisfaction of its claims through the court-approved bankruptcy sale of Vital Pharmaceuticals, Inc. ("VPX") and the comprehensive settlement embodied in the Rule 9019 Order. The same principle is reflected in Federal Rule of Civil Procedure 60(b)(6), which permits relief for "any other reason that justifies relief." This catch-all provision is grounded in the Court's equitable powers and encompasses the one satisfaction rule—long recognized as a safeguard against duplicative recoveries for a single injury. To permit Monster to continue pursuing Defendant personally would undermine these rules, established case law, and the integrity of the bankruptcy process, and would effectuate precisely the kind of impermissible double recovery the one satisfaction doctrine forbids.

Federal courts, including those in the Southern District of Florida, have repeatedly emphasized that there is nothing inherently privileged or inviolable about settlement agreements. See *Kadiyala v. Pupke*, No. 17-80732-CIV, 2019 WL 3752654 (S.D. Fla. Aug. 8, 2019) (reviewing cases and finding no privilege protecting settlement agreements from disclosure); *In re Denture Cream Prods. Liab. Litig.*, No. 09-2051-MD, 2011 WL 1979666, at *5 (S.D. Fla. May 20, 2011) ("There is nothing magical about a settlement agreement. It is ultimately just a contract between two parties... Rule 26 has no exception for settlement agreements."); *Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc.*, No. 05-60860-CIV, 2007 WL 1526649, at *3 (S.D. Fla. May 22, 2007) (same). Here, the Asset Purchase Agreement ("APA") and the 9019 Settlement Order are not mere private arrangements—they are binding, enforceable, and court-approved instruments that collectively form a comprehensive resolution of Monster's claims against VPX and any related parties, including Mr. Owoc.

As part of that resolution, Monster knowingly and voluntarily agreed to treat its litigation judgment—valued at approximately $377 million—as a non-priority, unsecured claim under the bankruptcy plan. In doing so, it relinquished any right to administrative priority status and expressly waived any future attempts at collection outside the bankruptcy process. These terms were not aspirational; they were explicit, enforceable, and cross-conditioned on Monster's participation in the asset sale. Section 7.2 of the APA expressly provided that Monster's claims, including those pending in the California District Court Action, would be "deemed allowed" solely as unsecured claims within the bankruptcy estate, and that Monster "shall not have an allowed administrative claim." These provisions were subsequently incorporated and formalized in the 9019 Order, which governed both the settlement and the transfer of VPX assets to Monster.

This structure was deliberate. Monster's entitlement to acquire Bang Energy's assets at a significantly discounted price was inextricably linked to its agreement to resolve its claims as a

8

general unsecured creditor, subject to the standard bankruptcy distribution waterfall. In essence, Monster got paid because it settled—receiving valuable assets and distribution rights in exchange for relinquishing any further claim to the litigation judgment. By accepting this court-approved bargain, Monster made an affirmative, strategic choice to resolve its litigation through the equitable and orderly processes of bankruptcy law.

Having elected this path, Monster is now barred—both legally and equitably—from circumventing the bankruptcy framework to extract additional recovery from Mr. Owoc personally. To allow otherwise would:

1. Violate the One Satisfaction Rule, which forbids recovery of more than one satisfaction for a single injury;

2. Contravene the express terms of the APA and the 9019 Order;

3. Undermine core principles of bankruptcy law, including the finality of court-approved settlements; and

4. Result in unjust enrichment, as Monster would receive the benefit of its negotiated bankruptcy recovery while also attempting to collect the full face value of a judgment it has already compromised and discharged.

Despite having already reaped substantial benefits from the VPX bankruptcy sale and the 9019 settlement, Monster continues to pursue Mr. Owoc for the entirety of its $377 million judgment. This conduct is precisely the type of overreach that Rule 60(b)(5) and (b)(6) were designed to correct, and it falls squarely within the Court's authority—and duty—to enforce.

## C. ANTITRUST VIOLATIONS: ILLEGAL MONOPOLIZATION AND COLLUSION

Monster Energy's acquisition of Bang Energy—its most significant and direct competitor—violates multiple provisions of federal antitrust law, as well as common law and statutory protections against unfair business practices.

First, under the **Sherman Antitrust Act, 15 U.S.C. § 2**, it is unlawful for any person or entity to monopolize, or attempt to monopolize, any part of trade or commerce. Monster's sustained litigation campaign against Bang Energy, followed by its subsequent acquisition of the company, is a textbook example of attempted monopolization. Rather than competing on the merits, Monster used the courts as a weapon to eliminate its primary rival.

Second, Monster's actions violate **Section 7 of the Clayton Act, 15 U.S.C. § 18**, which prohibits mergers or acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly." Number two energy drink, Monster acquiring number three energy drink, Bang Energy—its largest and most disruptive independent competitor, after driving it into bankruptcy through aggressive litigation, effectively neutralized meaningful competition in the energy drink market. This acquisition should have been reviewed and blocked by the Federal Trade Commission (FTC) under existing merger guidelines.

Third, Monster's conduct constitutes a **common law abuse of process**. The company misused judicial proceedings, not to obtain legitimate legal relief, but to financially cripple Bang Energy, force out its founder Jack Owoc, and then acquire the brand—valued in the billions—for a fraction of its true worth. This manipulation of the judicial system for improper ends exemplifies the tort of abuse of process.

Fourth, Monster's actions fall within the scope of **unfair competition and business torts**, including violations of **California's Business and Professions Code § 17200**, which prohibits unlawful, unfair, and fraudulent business practices. Monster engaged in a calculated campaign targeting Bang Energy's intellectual property, business goodwill, and market share, using unfair and deceptive tactics to gain control of its rival's assets.

Fifth, Monster is not entitled to immunity under the **Noerr-Pennington doctrine**, which protects legitimate petitioning of the government, including the courts. As established in *Professional Real Estate Investors v. Columbia Pictures Industries*, 508 U.S. 49 (1993), sham litigation is not protected. Monster's lawsuits against Bang were objectively baseless and were initiated with the primary intent to harm a competitor rather than to resolve any actual legal dispute. As such, they fall within the **sham litigation exception** to Noerr-Pennington immunity.

## D. THE TRUE VALUE OF BANG ENERGY – STOLEN THROUGH FRAUD AND LITIGATION ABUSE

Kroll LLP—a top-tier financial valuation firm—placed Bang Energy's value in the multi-billion-dollar range. **Exhibit E.** At the same time, Keurig Dr Pepper (KDP) made a $3.7 billion offer to purchase Bang directly from Mr. Owoc. Furthermore, Bloomberg and Reuters widely reported a transaction by KDP to acquire Bang for billions of dollars. The authenticity of this multi-billion-dollar offer was confirmed under oath by Charles Delo of Rothschild Investment Co. and by John Owoc, with supporting documentation included in the bankruptcy record. Yet, Monster acquired Bang out of bankruptcy at a fraction of its real value after orchestrating its destruction through litigation. **Exhibit F**

## E. MONSTER'S DEADLY ENERGY DRINK VS. BANG'S UNIVERSITY RESEARCH PROVEN PERFRMANCE-ENHANCING SUGAR FREE FORMULA

Monster Energy has been linked to 20 deaths, 10 heart attacks, and over 100 serious adverse events, according to GAO data obtained via FOIA. (Exhibit D)

In contrast, Bang Energy contains zero sugar, no artificial colors or flavors, has a strong safety record, and is backed by university-led clinical studies with human test subjects. There are no reports of deaths, heart attacks, or serious adverse effects linked to Bang.

Unable to compete on merit, Monster resorted to litigation, misinformation, and allegedly manipulating the bankruptcy system. After driving Bang into the ground, Monster repackaged the brand and now sells it through Coca-Cola's distribution network—pretending they created it, while erasing the legacy of Jack Owoc, the founder they once envied and now seek to silence.

## F.  FRAUDULENT ACQUISITION FOR $362 MILLION: SATISFACTION TENFOLD

In one of the most appalling abuses of bankruptcy law in modern history, Monster Energy Drink Corporation acquired Bang Energy for a mere $362 million—a fraction of its true value—through a bankruptcy process that was tainted by conflicted actors, and suppressed evidence. At the time of acquisition, Bang Energy had already been valued at ~$3.7 billion by Keurig Dr Pepper's formal acquisition offer, and independent assessments by Kroll LLP, one of the most reputable valuation firms in the world, supported this multibillion-dollar enterprise value. Around the same time Cerberus Capital Management L.P. spent hundreds of thousands of dollars researching and investigating the acquisition of Bang Energy. After many months of intense due diligence, meetings and presentations by Mr. Owoc and his key staff members, and after spending many hours in the data room, Cerberus put forth an indication of interest to acquire Bang Energy for $1 billion dollars. Gary Smith, from Providence Capital, another interested Bang Energy bidder seeking to acquire Bang Energy stated, "Absolutely, Monster ran off Cerberus."   By all accounts Bang Energy was a multi-billion dollar brand—that was sabotaged and litigated into insolvency.

12

Monster's acquisition for $362 million was not simply a "satisfaction" of its alleged damages—it was a windfall ten times over. After obtaining a massive litigation judgment, Monster proceeded to take full control of Bang's brand equity, product IP, trademarks, customer loyalty, social media platforms, national shelf space, and a built-in revenue pipeline—all of which now generate profits under Monster's control and are being distributed through Coca-Cola's global distribution system. This is not a case of double satisfaction. It is tenfold satisfaction—a systemic looting of Bang Energy's market position, goodwill, and enterprise value through a corrupted bankruptcy that rewarded the very entity responsible for Bang's demise.

## G. MONSTER'S OBSESSION WITH JACK OWOC AND THE WAR ON BANG ENERGY®

Monster Energy's actions against Jack Owoc and Bang Energy® were not just competitive—they were deeply personal. What started as market rivalry quickly turned into a vindictive obsession to destroy Mr. Owoc and the brand he created.

Monster launched an aggressive smear campaign, even distributing small defamatory cards in retail stores—some placed directly on Bang products—attacking Mr. Owoc by name. This was not advertising; it was a calculated effort to publicly discredit and humiliate him.

Bang Energy posed a serious threat to Monster's dominance. With former annual growth rates of 200–300%, a wide variety of flavors, a zero-sugar formula, and the backing of clinical research, Bang had redefined the energy drink category as a performance-based product. It was on track to become the second-largest energy drink brand in the world. Monster couldn't compete on innovation, so it turned to defamation and destruction.

For over 13 years, Monster waged a relentless legal campaign. One lawsuit after another, not to resolve actual disputes, but to exhaust Vital Pharmaceuticals' resources and momentum. The strategy was simple: outspend Mr. Owoc's legal team, drag the company through endless litigation, and seize the brand in bankruptcy for a fraction of its value.

Monster's blueprint was clear—use the courts to overwhelm Mr. Owoc, sabotage Bang's growth, and take control of the company through legal and financial pressure. That plan succeeded.

Most recently, Monster escalated its efforts by placing an unlawful lien on the Owoc family's Florida Homestead, where Jack, his wife, and their six children live. This property is constitutionally protected under Florida Homestead law, but Monster ignored those protections. Its ongoing misuse of the legal system shows a disregard not only for fair competition but for basic legal and ethical boundaries.

## H. FINAL TRUTH: THE GREATEST SABOTAGE IN ENERGY DRINK HISTORY

This was never a fair fight. Jack Owoc built Bang Energy from scratch—a groundbreaking brand that redefined the energy drink market and delivered real performance. Monster didn't win through better products or innovation. It won through sabotage.

Instead of competing fairly, Monster weaponized the legal system, spread defamatory claims, and launched a calculated campaign to destroy Bang. Its actions represent one of the most blatant abuses of power in the history of the beverage industry.

Formerly operating as Hansen Beverage, Monster Beverage Corporation—now Monster Energy Corporation—has been involved in at least 419 lawsuits. Of those, 289 were initiated by the company itself, reflecting what appears to be one of the most extreme and sustained patterns of vexatious litigation in modern American corporate history.

14

Importantly, this figure likely captures only a portion of the company's full litigation footprint. Due to jurisdictional fragmentation, sealed court records, confidential settlements, and the lack of a centralized public litigation database, it is virtually impossible for private individuals or investigative entities to uncover the true total number of cases involving Monster. Nevertheless, even this partial record reveals a disturbing trend: a company that has weaponized the courts not to seek justice, but to intimidate competitors, suppress dissent, and overwhelm opponents through sheer legal force.

Had Monster not manipulated the process, Bang Energy would likely be the second-largest energy drink brand in the world today—and Monster would have lost its grip on the market.

This isn't just a case of corporate rivalry. It's a cautionary tale for every entrepreneur: when your innovation threatens a monopoly, they won't out-create you—they'll try to crush you with lawsuits, deception, and money. Bang Energy thrived because it worked. Monster prevailed because it cheated.

## I. BANG ENERGY'S INNOVATION AND SUCCESS

Jack Owoc invented Super Creatine, a creatine-leucine compound engineered to be water-stable and functional in ready-to-drink formulas. The trademark SUPER CREATINE® was officially registered on February 6, 2019 (Reg. No. 5,252,855). Between 2016 and 2019, VPX—Bang Energy's parent company—experienced explosive growth of approximately 200% year over year, generating an estimated $1.28 billion in retail sales in 2019, $626 million in net revenue, and an extraordinary $217 million in EBITDA. By 2022, VPX had become the third best-selling energy drink brand in the United States, following Red Bull and Monster Energy.

In 2018, Monster Energy filed a lawsuit in the Central District of California (Case No. 5:18-cv-1882), accusing VPX of false advertising related to the use of Super Creatine. The jury, in 2022,

awarded Monster $293 million—a figure later increased with attorneys' fees. However, the litigation was deeply flawed. Monster's own internal study revealed that only 3% of consumers were influenced by Super Creatine, but the court barred this critical evidence from being presented to the jury. Furthermore, an independent study from the highly regarded Peking Biotech Medical School in China showed that Super Creatine, tested every two hours over a 24-hour period, significantly increased blood creatine levels throughout the duration. Despite the clear scientific relevance, the court actively suppressed this evidence and disallowed its introduction at trial.

The court had previously stated that it would allow the Super Creatine study into evidence if Monster "opened the door." When Megan Owoc, Senior Vice President of Marketing for Bang Energy, testified under oath that she was aware of a study confirming that Super Creatine elevated creatine levels in the blood, the court reneged on its promise and prohibited her testimony. This reversal deprived the jury of key context that could have entirely changed the outcome of the case and potentially led to Mr. Owoc receiving compensation rather than a devastating judgment. Moreover, 97% of Bang customers chose the brand not because of Super Creatine but for its 43 innovative and flavorful options, cutting-edge marketing, and health and performance benefits. Megan Owoc testified that Bang's marketing emphasized its sugar-free formula, bold flavors, and uplifting brand style—contrasting sharply with Monster's deadly drink.

This lawsuit was not a legitimate legal dispute—it was a strategic move designed to weaponize litigation, bankrupt VPX, and eliminate a rising competitor. The conduct exhibited by Monster Energy fits the definition of sham litigation, abuse of process, and anticompetitive behavior.

In a second coordinated and highly suspect legal assault, Monster Energy secretly acquired rights to a 2010 confidential settlement agreement between VPX and Orange Bang, Inc.—an agreement never intended for third-party enforcement. Using this confidential contract as a pretext,

Monster initiated arbitration proceedings against VPX. This maneuver, carried out without transparency or adequate notice, ultimately resulted in a $175 million arbitration award and imposed a 5% royalty on all future Bang sales. These legal and financial consequences created nearly $500 million liability for VPX, not including the indefinite and compounding royalty, which could eventually exceed one billion dollars. Monster's acquisition of the Orange Bang agreement was not only commercially predatory, but also legally questionable, possibly violating multiple state and federal laws. The legality of this tactic—particularly regarding improper contract assignment, antitrust violations through market consolidation, and potential fraud in inducement—has yet to receive appropriate judicial scrutiny.

Monster Energy Corp.'s acquisition of the Orange Bang licensing agreement was not a good-faith business move—it was a calculated scheme to sue and destroy its rival, Bang Energy. This conduct constitutes a likely violation of federal antitrust law, including: Sherman Act §2 – Attempted monopolization through sham litigation and predatory legal tactics; FTC Act §5 – Engaging in unfair methods of competition by misusing a contract to eliminate a market rival; Abuse of Process – Weaponizing judicial procedures not to enforce rights, but to cripple a competitor; Tortious Interference – Disrupting Bang Energy's lawful business relations through a hostile takeover of its licensing agreement.

This is legal warfare masked as commercial enforcement, designed to suppress competition and monopolize the market. Monster's conduct reflects unclean hands and warrants immediate scrutiny by the FTC, DOJ, and courts as a blatant abuse of both contract and antitrust law.

## J. IRS EVIDENCE OF FULL SATISFACTION AND FRAUDULENT UNDERVALUATION (Based on IRS-Imposed Bargain Purchase Tax Gain and Third-Party Valuations, **EXHIBIT C**)

This Court should apply the One Satisfaction Rule and bar Monster Energy Company from recovering any further damages against Bang Energy (Vital Pharmaceuticals, Inc.) or its founder, Jack Owoc, because Monster has already received compensation far exceeding any alleged harm. Monster's acquisition of Bang Energy produced a significant financial windfall that includes a $45.4 million capital gains tax imposed by the IRS—reflecting an estimated $227 million bargain purchase gain—along with independent third-party valuations and multi-billion-dollar acquisition offers from Keurig Dr Pepper and Cerberus Capital. These factors collectively establish that Monster Energy not only recouped its supposed losses but profited well beyond them.

The $45.4 million tax liability assessed by the IRS is not speculative. Under a presumed 20% capital gains rate, the IRS recognized a $227 million gain from Monster's acquisition, implying Bang Energy's fair market value was at least $589 million. This figure was derived from adding the $227 million IRS-recognized gain to the $362 million purchase price. The IRS made this determination based on structured valuation methodologies and legal standards, such as those under 26 C.F.R. § 1.61-6, which states that gain realized from acquiring property for less than fair market value is includible as taxable income. Thus, the IRS confirmation of an economic gain proves that Monster underpaid substantially and still received a large financial benefit.

Critically, this $227 million gain is a conservative figure, as the IRS reached it without access to vital valuation evidence. The agency was not provided with a $3.7 billion enterprise valuation of Bang Energy prepared by Kroll, nor the $3.7 billion acquisition offer from Keurig Dr Pepper or the $1 billion bid from Cerberus Capital. Had this information been disclosed, the IRS's calculated bargain purchase gain and related tax would have dramatically increased, possibly into the hundreds of millions more—demonstrating that the true benefit Monster received was vastly understated.

18

This context raises serious concerns about fraud, bankruptcy misconduct, and deliberate undervaluation. The IRS relies on hard data, not conjecture, so the $227 million gain implies that Bang Energy's assets were systemically undervalued in the sale. Given Bang Energy's $7.25+ billion lifetime retail sales, proprietary intellectual property, powerful branding, and a $125 million distribution system, the $362 million acquisition price—representing a massive fire-sale discount— is simply not justifiable. Such a discount is only plausible if fair market valuations were hidden, competing offers were ignored, or collusion occurred during the bankruptcy process.

The hallmarks of bankruptcy fraud are evident in the exclusion of KDP and Cerberus's offers, the suppression of Kroll's valuation, and the failure to disclose any of this to the bankruptcy court or the IRS. These omissions amount to fraudulent concealment of material financial information, deprivation of a fair, market-based sale process, and a transaction structured to benefit one bidder— Monster Energy—at the direct expense of creditors, equity holders, and the public tax system.

## K. CALIFORNIA AND FLORIDA SET-OFF PRINCIPLES: LIMITATIONS ON DOUBLE RECOVERY

i.      *Both California and Florida law prohibit double recovery and require set-offs when a creditor has already received full or partial satisfaction for their claims.*

Under both California and Florida law, courts prohibit double recovery and require set-offs when a creditor or plaintiff has already received full or partial satisfaction for their claims. In California, the principle is well-established through case law. In *Reed v. Wilson*, 73 Cal. App. 4th 439 (1999), the court held that set-offs are necessary to prevent unjust enrichment by ensuring a plaintiff does not collect twice for the same claim. See also Section 877 of the Code of Civil Procedure. Similarly, in (*Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal. 3d 488, 494-498 [213 [73 Cal. App. 4th 444] Cal.Rptr. 256, 698 P.2d 159]; *Mattco Forge, Inc. v. Arthur Young & Co.* (1995) 38 Cal. App. 4th 1337, 1349 [45 Cal. Rptr. 2d 581].) It was

made clear that a settlement with one tortfeasor must reduce claims against others by the full amount of that settlement. The California courts reaffirmed this rule in *Hoch v. Allied-Signal, Inc.*, 24 Cal. App. 4th 48 (1994), emphasizing that a plaintiff cannot recover more than the actual amount of damages suffered.

Florida law likewise mandates that courts apply set-offs to avoid multiple recoveries for a single injury. Section 768.041(2), Florida Statutes, requires that any compensation already received must be deducted from any remaining judgment or claim. *Escadote I Corp. v. Ocean Three Ltd. P'ship*, 211 So. 3d 1059, 1062 (Fla. 3d DCA 2016); the court confirmed that set-offs must be applied to reflect prior payments.

## CONCLUSION

For the reasons stated above, Defendant Jack H. Owoc respectfully requests that this Court:

1. Declare that Monster Energy's continued collection efforts against Mr. Owoc personally constitute an impermissible double recovery in violation of the One Satisfaction Rule;

2. Issue an injunction prohibiting Monster from engaging in any further collection activity related to the judgment against Mr. Owoc;

3. Order Monster to remove all existing liens from Mr. Owoc's personal and real property;

4. Enforce the Asset Purchase Agreement (APA) and the Bankruptcy Court's 9019 Order as a final and binding settlement of Monster's claims; and

5. Grant any further relief the Court deems just and appropriate.

Respectfully submitted,

**John (Jack) H. Owoc**

**Pro-Se Movant**

3052 N. Atlantic Blvd,
Fort Lauderdale, FL 33308
Jackowoc.ceo@gmail.com
PHONE: (954) 632-7119

## CERTIFICATE OF CONFERRAL PURSUANT TO LOCAL RULE 7.1(a)(2)

Pursuant to Local Rule 7.1(a)(2) of the United States District Court for the Southern District of Florida, I, Jack H. Owoc, the pro se Defendant, certify that I attempted in good faith to confer with counsel for Plaintiff Monster Energy Company regarding the relief sought in the accompanying motion.

As of the time of this filing, counsel for Plaintiff opposes the relief requested, and the parties were unable to resolve the issues raised in the motion. Accordingly, the motion is respectfully submitted for the Court's consideration.

Respectfully submitted, August 11th , 2025



**John (Jack) H. Owoc**